IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:03-CV-772-BO(3)

| | | |
|---|---|---|
| THEODORE M. BANKS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | O R D E R |
| | ) | |
| NORTH CAROLINA DEPARTMENT | ) | |
| OF CORRECTIONS, HARNETT | ) | |
| CORRECTIONAL INSTITUTION, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This case is before the Court on the parties' supplemental Motions for Summary Judgment. For the following reasons, Plaintiff's Motion will be DENIED and Defendant's Motion will be GRANTED.

## BACKGROUND

Plaintiff was a Correctional Officer ("CO") employed by Defendant North Carolina Department of Corrections ("NCDOC") at Harnett Correctional Institution ("HCI") in Lillington, North Carolina, from February 26, 1996 until December 26, 2003. Plaintiff alleges that he was sexually harassed by his supervisor, Sergeant Sennie Williams ("Williams") beginning in early 1998 when Plaintiff started working as a CO. According to Plaintiff, Williams made sexually suggestive comments to Plaintiff, touched him inappropriately, paid undue attention to him, and called him after work hours. Plaintiff says that Williams' behavior persisted even after he rejected her advances on numerous occasions.

In May of 1999, Plaintiff discontinued all non-work related discussions with Williams.

As a result, Plaintiff contends that Williams retaliated by discrediting him with superior officers responsible for management of the facility. Specifically, on May 31, 1999, an incident occurred in which an inmate was caught stealing, and then directed profane language at Williams. The inmate was assigned to a dorm supervised by Plaintiff. Plaintiff alleges that Williams intentionally misrepresented Plaintiff's response during the incident to Plaintiff's superior officers, including Lieutenant Thomas Tart ("Tart") and Captain Willie Surles ("Surles"). According to Tart and Surles, Plaintiff not only failed to adequately respond to the incident, but was also deliberately unhelpful during the subsequent investigation of the prisoner's conduct.

A second incident involving Plaintiff occurred a few weeks later. On June 19, 1999, while Surles was addressing Second Shift COs about mandatory training, Plaintiff allegedly interrupted by loudly stating "are we going to get paid for this?" Surles says Plaintiff continued to be insubordinate throughout the meeting, and made a number of additional inappropriate comments. In view of the May and June incidents, Tart and Surles decided to discipline Plaintiff. For his infractions, Plaintiff was banned for sixty days from a list of employees eligible to serve as "Acting Sergeants," and further required to take part in a "coaching plan" designed to improve his job performance.[1] Acting Sergeant is not a position with increased pay. Rather, when there are an insufficient number of Correctional Sergeants on duty, HCI relies on a list of eligible Acting Sergeants – mostly CO's – in order to fill the temporary vacancies.

Additionally, in July of 1999, Plaintiff was transferred to another section of the prison, under the supervision of Sgt. Jerome Bacon ("Bacon"). Tart allegedly told Plaintiff he was

---

[1] These incidents also resulted in Sergeant Williams putting a notation of "below good" on Plaintiff's performance log for June 17, 1999. Plaintiff's other performance ratings, both before and after that date, were either "good" or "very good."

transferred because he was "in a slump."[2] Neither Plaintiff's initial suspension from the Acting Sergeant List, nor his transfer to another section at HCI, involved a demotion or a reduction in pay.

On August 4, 1999, Plaintiff formally filed a complaint detailing the harassment by Williams with NCDOC's Equal Employment Office ("EEO"). His allegations were investigated by EEO Supervisor Cheryl Fellers ("Fellers") in October of 1999.[3] Fellers concluded that Plaintiff's complaints about sexual harassment were justified, and recommended that corrective action be taken with respect to Williams. Williams was subsequently demoted and transferred because of the harassment.

Plaintiff continued to work under Bacon's supervision. From July onward, Bacon reported that Plaintiff exhibited a professional demeanor, performed his duties well, and displayed no further attitude problems. Plaintiff's suspension was set to lapse in September of 1999, and Bacon thought him ready to return to the Acting Sergeant List. Tart, however, believed that Plaintiff's insubordination had been severe, and set a bad example for other Second Shift employees. After consulting with Surles, Tart therefore extended Plaintiff's suspension indefinitely.

In January of 2000, Plaintiff filed a formal sexual harassment complaint (the "First Charge") with the Civil Rights Division of the North Carolina Office of Administrative Hearings

---

[2] Surles and Tart have submitted affidavits claiming that Sgt. Williams was not involved in either the decision to discipline Plaintiff or transfer him to another work location.

[3] Plaintiff did not officially report the incidents of sexual harassment until August of 2004. However, during June of 1999, Plaintiff claims to have discussed his concerns about the harassment with another shift Lieutenant. At that time, Plaintiff had not reported the harassment to Tart, Surles, the EEO Office or the Office of Administrative Hearings.

3

("OAH"). OAH is designated as North Carolina's deferral agency for the United States Equal Employment Opportunity Commission ("EEOC").[4] The First Charge alleged that Plaintiff's July 1999 transfer was initiated in retaliation for reporting sexual harassment. Plaintiff further claimed that he was subjected to additional retaliation by Williams after filing his EEO complaint in August of 1999. According to Plaintiff, Williams demeaned him, questioned his competence, and gave him false performance evaluations. Plaintiff also said other superiors discriminated against him because of his race.

Plaintiff's suspension from the Acting Sergeant List continued in the meantime. He eventually complained to Tart's replacement, Lt. Harvey Clay ("Clay"), who discontinued the suspension. Clay returned Plaintiff to the Acting Sergeant List on March 6, 2000. Following an investigation by a second EEO investigator, Larry Peace ("Peace"), the EEO concluded on July 24, 2000 that there was no merit to Plaintiff's First Charge.

Almost two years later, in April of 2002, Plaintiff filed a second OAH complaint (the "Second Charge"). This stemmed from an episode in late January of the same year, when a Corrections Administrator had authorized a drug search of all prison personnel, including Correctional Officers. A K-9 unit assisting in the search indicated that Plaintiff might have narcotics on him. After he consented, both Plaintiff and his automobile were searched, and no drugs were found. Plaintiff alleged that the K-9's handler made the K-9 give a "false positive" drug alert; that Plaintiff was subjected to a more extensive search than other officers because he

---

[4] There is some discrepancy in Plaintiff's filings as to when he made his first formal complaint with the EEOC. Plaintiff's Second Amended Complaint indicates that the charge was filed on January 24, 2000. The filing itself indicates that the Civil Rights Division received the file on February 2, 2000.

4

is African-American;[5] and that the search was also represented retaliation for his prior filing of employment discrimination complaints.

Plaintiff filed his final OAH complaint (the "Third Charge") on June 3, 2002. This time Plaintiff alleged that, during a Second Shift employees' line-up on May 17, 2002, Surles said that "Second Shift has some excellent officers, with the exception of some problematic officers who keep filing EEO complaints." Plaintiff construed these remarks as retaliation for his filing of the two earlier charges.

Plaintiff received right-to-sue letters from the EEOC regarding all three charges. Proceeding without an attorney, he then filed this action on October 14, 2003. The parties thereafter filed cross-Motions for Summary Judgment. In an Order dated March 30, 2006 ("March 30, 2006 Order"), the Court denied Plaintiff's Motion for Summary Judgment. It also granted summary judgment for Defendants with respect to all Plaintiff's claims, save only the retaliation claim. Plaintiff had identified a total of five separate retaliatory acts: (1) the disciplinary actions of July 1999; (2) his subjection to a personal narcotics search; (3) extension of his suspension in September 1999; (4) Surles' remarks during the meeting with Second Shift employees; and (5) the failure to promote Plaintiff after repeated applications.

The March 30, 2006 Order found the first four allegations to be unsupported or insufficient to make out a *prima facie* case of retaliation. March 30, 2006 Order at 11. Among other things, the Court observed that neither the extension of Plaintiff's suspension nor Surles's remarks represented adverse employment action under Title VII's retaliation provision. *Id.*

---

[5] During the search, the K-9 indicated that three officers, including Plaintiff, might have narcotics. The other two officers investigated were white.

However, Plaintiff had come forth with evidence of a retaliatory failure to promote. *Id.* at 11-12. Because Defendants had presented neither evidence nor argument on this point, the Court permitted Plaintiff's failure to promote theory to go forward. *Id.* at 12.

The March 30, 2006 Order had analyzed Plaintiff's extended suspension and Surles' remarks in light of *Von Gunten v. Maryland,* 243 F.3d 858 (4th Cir. 2001). *Von Gunten* had understood "adverse employment action," in the Title VII retaliation context, to mean one that "adversely effect[s] a term, condition, or benefit of [] employment. *Id.* at 869. Because neither the extension of Plaintiff's suspension nor Surles' comments impacted upon Plaintiff's job description, the Court rejected both as bases for his retaliation suit. However, on June 22, 2006, the Supreme Court decided *Burlington Northern & Santa Fe Railway Co. v. White,* 126 S.Ct. 2405. *Burlington Northern* did away with *Von Gunten's* interpretation of "adverse employment action," holding instead that such action must be "materially adverse," or likely to "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Id.* at 2415 (citations omitted). Because its prior Order partially rested upon superseded authority, the Court instructed the parties to submit a second round of summary judgment briefing.

## DISCUSSION

### I. Applicable Law

#### A. Summary Judgment Standard

A motion for summary judgment cannot be granted unless there are no genuine issues of material fact for trial. FED. R. CIV. P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). The moving party must demonstrate the lack of a genuine issue of fact for trial, and if that burden is met, the party opposing the motion must "go beyond the pleadings" and come forward with

evidence of a genuine factual dispute. *Celotex,* 477 U.S. at 324. The Court must view the facts and the inferences drawn from the facts in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88 (1986). Conclusory allegations are not sufficient to defeat a motion for summary judgment. *Cf. Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986) ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.") (emphasis in original).

### B. Title VII Retaliation Framework

To establish a *prima facie* case of retaliation, a Title VII plaintiff must come forth with evidence that: (1) he engaged in protected activity; (2) his employer took an adverse employment action against him; and (3) a causal relationship exists between the adverse action and the protected activity. *EEOC v. Navy Fed. Credit Union,* 424 F.3d 397, 405-06 (4th Cir. 2005).

"Adverse employment action" must be material, in that it would likely "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern,* 126 S.Ct. at 2415 (citations omitted). However, "an employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* (citations omitted).

If the plaintiff satisfies all three elements above, the burden shifts to the employer, who must articulate a legitimate, non-discriminatory reason for the allegedly retaliatory conduct. *McDonnell-Douglas Corp. v. Green,* 411 U.S. 792, 802-04 (1973). The burden will then pass back to the plaintiff, who in turn must demonstrate that the employer's proffered reason is pretextual. *Id.* The plaintiff can do so by showing that th employer's explanation is incredible,

7

or suggests a retaliatory motive. *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004).

## II. Plaintiff's Allegations

As noted above, Plaintiff originally alleged five instances of retaliation for his having pursued a sexual harassment claim against Williams. The Court previously rejected the first two, the July 1999 disciplinary actions and the narcotics search. The July measures occurred before Plaintiff first engaged in protected activity, by filing his EEO complaint. Likewise, although the narcotics search took place after he filed his harassment claim, Plaintiff had produced no evidence of a causal link between the drug search and his harassment allegations.[6] *Id.* Thus, even if the July disciplinary measures or the drug search amount to "adverse employment action" under *Burlington Northern's* new standard, both allegations would still fail to support a *prima facie* case of retaliation.

By contrast, though neither Plaintiff's extended suspension nor Surles' remarks amounted to "adverse employment action" under *Von Gunten*, one or the other might satisfy *Burlington Northern* and must thus be reconsidered here. As for Plaintiff's failure to promote theory, the March 30, 2006 Order permitted this to go forward, as Defendants had not responded to Plaintiff's evidence on that issue. Defendants' recent submission, however, offers evidence and argument against Plaintiff's claim of retaliatory non-promotion. The Court accordingly will re-evaluate only three of Plaintiff's original five allegations: (1) Defendants' refusal to promote

---

[6] The Court also stated that the search did not amount to "adverse employment action" under *Von Gunten*. March 30, 2006 Order at 11. Under the broader construction enunciated by *Burlington Northern*, an illegal search might well amount to actionable conduct, to the extent it would likely intimidate a reasonable employee from pursuing claims of sexual harassment. 126 S.Ct at 2415. However, that much would not affect Plaintiff's failure to present evidence of a causal connection between his sexual harassment claims and the search.

8

Plaintiff; (2) Surles' remarks during his meeting with Second Shift Employees; and (3) the extension of Plaintiff's suspension from the Acting Sergeant List, in September of 1999.

**1. Failure to Promote**

Plaintiff has produced evidence of Defendants' retaliatory refusal to promote him to the position of Correctional Sergeant. EEO investigator Peace's affidavit asserted that HCI Correctional Administrative Services Manager Benjamin Foster ("Foster") had told Peace that "no matter the outcome of the investigation, [] we would see to it that Mr. Banks is never promoted to Sergeant, regardless of where he transfers."[7] Thereafter, Plaintiff twice applied, unsuccessfully, for a promotion to the rank of Correctional Sergeant: once in 2002, for one of twenty-five available positions at Scotland County Correctional Institution ("Scotland"), and again in 2003 for one of two positions at HCI. Both applications were unsuccessful. As the Court noted in its prior Order, this evidence raised an inference that Plaintiff was refused promotions in reprisal for engaging in protected activity. At the time, Defendants had offered neither evidence or counterargument regarding Plaintiff's attempts at promotion, instead arguing incorrectly that the Court was without jurisdiction to assess Plaintiff's failure to promote theory.

Defendants' supplemental briefing picks up where its initial Motion for Summary Judgment left off. Defendants acknowledge that by the time of the Scotland and HCI applications, Plaintiff had engaged in protected activity; and further that the refusal to promote him would constitute adverse employment action, under *Von Gunten* as well as *Burlington Northern*. Defendants now press their case on causality, relying on evidence that personnel who evaluated Plaintiff's applications had neither contact with Plaintiff's supervisors nor knowledge

---

[7] In his affidavit, Foster vigorously denies having made such a statement to Peace.

9

Case 5:03-cv-00772-BO    Document 92    Filed 08/20/07    Page 9 of 16

of his harassment or discrimination claims. Defendants also argue alternatively that Plaintiff's applications were denied for non-discriminatory reasons.

Whatever the merits of their causation argument,[8] Defendants have presented sufficient evidence that Scotland and HCI both legitimately rejected Plaintiff's applications for promotion. At the time of Plaintiff's application to Scotland, the minimum qualifications for a Correctional Sergeant position included a high school diploma; twenty four months' experience as a correctional officer; and passage of the Correctional Sergeant's Promotional Exam within the last five years. However, under NCDOC's merit-based hiring system, only "most qualified" candidates – those holding qualifications above and beyond the minimum – were selected to fill available positions. Scotland's Correctional Administrator had determined that "most qualified" Correctional Sergeant applicants would include only candidates with sixty months of qualifying educational or Correctional Officer experience *beyond* the minimum. When he applied to Scotland in 2002, Plaintiff held a high school diploma, but had only worked as a Correctional Officer for a total of eighty months. Because Plaintiff's cumulative work experience exceeded

---

[8] NCDOC policy forbade human resources from speaking to an applicant's employing unit; current employers would only be contacted after job candidates had been initially recommended. Consistent with that policy, Barbara Pierce ("Pierce"), the Scotland official solely responsible for screening applicants to Correctional Sergeant positions, denied having any contact with Foster or other HCI personnel throughout the pendency of Plaintiff's application. Pierce likewise claimed to be unaware of Plaintiff's Title VII and OAH complaints. Similarly, Foster says he never spoke to anyone about Plaintiff's Scotland application; that nobody from Scotland ever contacted him about Plaintiff; and further that he did not know Plaintiff had sought a Correctional Sergeant job at Scotland.
  As far as his application to Scotland is concerned, Plaintiff cannot show the existence of a causal link between the failure to promote and his protected activity. Plaintiff's showing regarding his application to HCI is stronger. Plaintiff claims that Foster – undisputedly an HCI administrative employee – informally influenced HCI's process of hiring Correctional Sergeants. The point is moot in any case, as Defendants have presented non-discriminatory reasons for refusing Plaintiff's attempts at promotion.

10

the minimum by only fifty-four months (instead of the required sixty), he was not considered a "most qualified" applicant, and consequently not chosen to interview for a Correctional Sergeant position.

The 2003 application to HCI was rejected because it was untimely. NCDOC policy requires applicants to apply for available jobs before a specified date. In this case, the posted vacancy announcement said applications for HCI Correctional Sergeants would be accepted from January 14, 2003 until January 23, 2003, and that applications received after 5:00 PM on the last day would not be considered. Plaintiff's application was postmarked from Fayetteville, North Carolina, on January 21, 2003. HCI's practice is to date-stamp all mail upon arrival, and Plaintiff's application was stamped as arriving at HCI on January 24, 2003. Consistent with NCDOC's policy, Plaintiff's HCI application was rejected as having been received after the closing date.

Plaintiff responds that HCI's date stamp can be altered to reflect any receipt date. However, he offers no evidence that HCI mail personnel defied ordinary procedures by stamping his application after its actual arrival. In other words, Plaintiff advances no evidentiary basis for rejecting Defendants' explanation for refusing his HCI application: receipt of the application after the deadline. *See, e.g., Williams v. Potter*, 331 F.Supp.2d 1331, 1346-47 (D.Kan., 2004) (adopting the defendant's non-discriminatory explanation for refusing to hire, when the plaintiff's job application was received four days after the posted deadline).

### 2. Surles' Remarks

Defendants next challenge the impact of Surles' remarks at a line-up of Second Shift employees. According to Plaintiff, Surles said that "Second Shift has some excellent officers,

11

with the exception of some problematic officers who keep filing EEO complaints." Surles disputes having made such a remark. For purposes of this allegation, Defendants once more concede protected activity and causation, arguing only that such comments, if made, did not amount to adverse employment action.

The Court agrees. Though it ultimately broadened the reach of Title VII's anti-retaliation provision, *Burlington Northern* still distinguished between material and trivial adversity, and reaffirmed that Title VII "does not set forth 'a general civility code for the American workplace.'" 126 S.Ct at 2415 (quoting *Oncale v. Sundowner Offshore Svs., Inc.*, 523 U.S. 75, 80 (1998)). In addressing the line-up, Surles did not mention Plaintiff specifically, or say that filing an EEO complaint would have negative consequences for any Second Shift employee. That convinces the Court that Surles' statements, though hardly professional, were not so extreme as to chill a reasonable employee from going forward with a discrimination claim. *Id.* Surles' remarks thus do not amount to adverse employment action, a necessary element of a *prima facie* retaliation case.

### 3. Extension of Plaintiff's Suspension from the Acting Sergeant List

As discussed above, Tart and Surles agreed in September of 1999 to extend, indefinitely, Plaintiff's suspension from the Acting Sergeant List. Defendants do not dispute that Plaintiff had by then lodged a formal harassment complaint, and thus engaged in statutorily protected activity. Defendants argue instead that the extended suspension does not meet *Burlington Northern*'s test for adverse employment action; that no evidence suggests that Plaintiff's protected activity triggered the suspension's extension; and finally that Defendants had a legitimate, non-discriminatory justification for prolonging the suspension in any event.

12

First, Defendants say the extended suspension did not altogether prevent Plaintiff from pursuing legal remedies: after Clay restored Plaintiff to the Acting Sergeant list, Plaintiff filed his First Charge with the OAH on January 2, 2000. According to Defendants, this alone demonstrates that the extension did not amount to "materially adverse action," in that Plaintiff was not ultimately discouraged from going forward with his case. Merely because a litigant elects to file additional discrimination claims does not mean that he was not deterred along the way. And the inquiry is not whether the employer's actions in fact intimidated a particular Title VII plaintiff, but whether the challenged conduct would likely dissuade a reasonable employee from making or supporting a discrimination suit. *Burlington Northern*, 126 S.Ct at 2415 ("[w]e refer to reactions of a *reasonable* employee because we believe the provision's standard for judging harm must be objective. An objective standard . . . avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's subjective feelings."). Objectively speaking, prolonging workplace sanctions could easily discourage a litigant in Plaintiff's position, by sending the message that more disciplinary measures - and diminished prospects for advancement -- would follow if he pursued his sexual harassment claim. Because extending Plaintiff's suspension from the Acting Sergeant list would likely dissuade a reasonable employee from supporting discrimination charges, the extension rose to the level of "adverse employment action." *Id.*

As for causality, Defendants concede that Plaintiff's suspension was extended in September 1999, roughly one month after he filed his sexual harassment complaint on August 4. Dft's. Br. at 16. The proximity of the extension to the complaint's filing raises an inference of causation and thus satisfies the third and final element of Plaintiff's *prima facie* case. *See*

13

*Anderson v. Coors Brewing Co.,* 181 F.3d 1171, 1179 (10th Cir. 1999) ("[a] one and one-half month period between protected activity and adverse action may, by itself, establish causation.").

The burden thus shifts to Defendants, who must demonstrate a lawful reason for extending Plaintiff's suspension. *McDonnell-Douglas,* 411 U.S. at 802-03. In his affidavit, Tart says Plaintiff's May and June misconduct had been serious, and set a bad example for other Second Shift employees. Upon receiving Surles' approval, Tart chose to prolong Plaintiff's removal from the Acting Sergeant List, in order further to observe his attitude.

Plaintiff insists that this justification is doubtful. *Price,* 380 F.3d at 212 (citations omitted). Bacon, who supervised Plaintiff after his July transfer, reported that Plaintiff was doing good work and exhibiting a proper attitude. In concluding that Plaintiff's demeanor needed to be scrutinized further (and his suspension extended indefinitely), Tart overrode Bacon – the HCI employee who had most recently observed Plaintiff, and reported favorably about his performance. As part of his investigation of Plaintiff's complaints, Peace also interviewed Bacon. Peace asked if it was standard procedure to extend an officer's probationary exclusion from the Acting Sergeant List; Bacon responded that he had never seen it done before. Clay, Tart's eventual replacement as Second Shift Lieutenant, similarly told Peace he had never before seen an extension of such a nature, and that he did not understand the reasons for it. In light of Bacon's report, as well as interview responses by Bacon and Clay, Plaintiff says Defendants' explanation for the extension is false.

That evidence establishes only that Bacon's opinion differed from the one shared by Tart and Surles, and that suspensions were rarely extended. *See Kulimani v. Blue Cross Blue Shield Ass'n,* 224 F.3d 681, 684 (7th Cir. 2000) (finding no pretext where human resources director

took unusual step of adding plaintiff's name to list of employees to be laid off, despite manager's prior decision not to include plaintiff on the list); *Reynolds v. Extendicare Health Svs., Inc.* 2006 WL 3168815 (S.D. Ohio, Nov. 1, 2006) (unpublished disposition) (rejecting employee's argument that explanation for termination was pretextual, because investigator had found it "unusual" that plaintiff had been fired one week before expiration of workplace disciplinary measure). Though it surely documents his subsequent improvement, Bacon's appraisal of Plaintiff casts no doubt on the original reason for Plaintiff's continued suspension: the severity of Plaintiff's original misconduct, and the bad example it set for other CO's. Bacon was not Plaintiff's supervisor at the time of the May and June 1999 episodes. Tart and Surles evidently thought that these were extraordinary enough to warrant suspension beyond the ordinary length of sixty days. The mere fact that Plaintiff's performance improved under Bacon's watch does not imply that Tart and Surles misjudged the extent of his original misconduct.[9] In other words, Bacon's positive evaluation does not raise an inference that Plaintiff's suspension was extended for retaliatory reasons. Nowhere did Bacon's report say, much less suggest, that the suspension was extended as a consequence of Plaintiff's harassment suit.

Similarly, though they expressed surprise at the suspension's continuation, neither Bacon nor Clay indicated that retaliation had motivated Tart or Surles. Rather, Bacon and Clay simply responded that they did not know of any similar extensions, and Clay confessed that he did not comprehend the basis for an extension in Plaintiff's case. As before, neither of these statements

---

[9] The Court emphasizes that a disagreement among managers about proper workplace sanctions, without more, is not evidence of pretext on Defendants' part. *Dejarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) ("[W]hen an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination.")

suggest that Plaintiff's Title VII claim played a role in prolonging his absence from the Acting Sergeant List. Rather, they reflect only that Plaintiff's case was exceptional, as far as typical disciplinary measures at HCI were concerned. As discussed above, supervising personnel thought Plaintiff's outbursts had been exceptionally disruptive, and thus adjusted his suspension accordingly. Plaintiff's evidence neither reveals this explanation's falsity, or points to Defendants' hidden retaliatory purposes. *Price,* 380 F.3d at 212. Defendants' legitimate reason for the extension remains unrebutted, and prevents Plaintiff's final factual allegation from stating a retaliation claim.

## CONCLUSION

No genuine, material factual disputes remain on Plaintiff's claim of retaliation, and Defendants are entitled to judgment as a matter of law. Plaintiff's Motion is DENIED, and Defendants' Motion is GRANTED.

SO ORDERED.

This _17_ day of August, 2007.

_____
TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE

16

Case 5:03-cv-00772-BO   Document 92   Filed 08/20/07   Page 16 of 16